# Supreme Court of Texas

No. 19-1069

In the Interest of J.W., a Child

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

**Argued September 15, 2021**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE YOUNG filed a concurring opinion.

JUSTICE BOYD filed a dissenting opinion.

JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Devine and Justice Busby joined.

In this difficult parental-termination case, we examine the legal sufficiency of the evidence to support the jury's finding, by clear and convincing evidence, that Father's parental rights to his child should be terminated. After a thorough review of the record, we hold that the jury reasonably could have formed a firm belief or conviction that (1) one statutory predicate ground for termination was met and (2) termination was in the child's best interest. However, we also hold that another

statutory ground was improperly submitted to the jury as part of a broad-form termination question. Because we cannot discern whether the jury terminated Father's rights on an invalid ground, and because he preserved the charge error, we reverse the court of appeals' judgment as to Father and remand for a new trial.

## I. Background

Mother and Father were married in February 2016. Mother had two children, "Jason" and "Doug." Her parental rights to her younger son, Doug, had been terminated in 2011 on the grounds that she (1) "knowingly placed or knowingly allowed [him] to remain in conditions or surroundings which endanger [his] physical or emotional well-being" and (2) "engaged in conduct or knowingly placed [him] with persons who engaged in conduct which endangers [his] physical or emotional well-being." TEX. FAM. CODE § 161.001(b)(1)(D), (E). Both children live with Jason's biological father, and Mother visits them often.

According to Kelly Allen, a supervisor with the Department of Family and Protective Services who participated in the investigation involving Doug, the case was opened because of concerns that Mother was using drugs and was not meeting Doug's medical needs. Allen testified that Doug, who has a medical condition involving deterioration of the muscles in his legs, was almost seven years old at the time of the investigation, had never been enrolled in school, could not read or write, and had not been provided the walker, wheelchair, therapy, or pain medication he needed. She was particularly concerned that Mother had

2

filled her own prescription "for an opiate" but had not obtained Doug's medication.

Allen also described two incidents in which Mother "absconded" with the children. Early in the investigation involving Doug, when Mother was informed that the Department would be removing him from her care, Mother left the Department's office with him and disappeared for over a week until law enforcement located them. She ultimately pleaded guilty to interference with an investigation, a misdemeanor offense, and was sentenced to 100 days in county jail. During a different Department investigation concerning Jason, law enforcement was called to locate him and Mother after she took him from the home of his biological father.

Mother learned that she was pregnant with J.W. in July 2016, five months after she and Father were married.[1] At the time, Mother worked for Sanderson Farms, a poultry-processing company, and had developed work-related respiratory issues for which she was taking Promethazine, a prescription medication that can contain codeine, an opiate. According to Father, Mother told him that she was concerned she had developed an opiate addiction that needed to be addressed in light of the pregnancy. They were referred to a facility in Florida where Mother could undergo a detox regimen, with inpatient treatment to follow. Mother entered the facility shortly before Thanksgiving and

---

[1] At one point, Mother named a different man as J.W.'s father on an application for government assistance, testifying that she did so because she did not want Father to know she was receiving benefits. Father took a paternity test confirming that he is J.W.'s biological father.

3

completed the five-day detox program. However, she refused any further treatment and instead returned to Texas. Father testified that she left the facility because it had confiscated her Promethazine and "wouldn't let her take" it.

When Mother returned from Florida, Father started working on a large project in Houston and was away from Mother for "most of . . . January and into February." Later in her pregnancy, Mother began treatment at a methadone clinic associated with a substance-abuse treatment center in Houston. Mother does not drive, and Father drove her from College Station to the clinic each day for two or three weeks. Mother reportedly planned to enter the affiliated treatment center, but she never enrolled and gave birth to J.W. unexpectedly at home on April 24, 2017.

Mother and J.W. were immediately transported by ambulance to the hospital, where J.W. was treated for respiratory distress caused by aspirating meconium into his lungs. In evaluating the cause of J.W.'s respiratory distress, the hospital conducted drug tests on both J.W. and Mother; Mother's urine tested positive for opiates and amphetamines, and J.W.'s tested positive for opiates. A sample of J.W.'s meconium collected on April 25 tested positive for opiates, amphetamines, benzodiazepine, barbiturates, and methadone. Dr. Khaled Hilal, J.W.'s treating neonatologist, testified that the benzodiazepine and barbiturates could be explained by medications the hospital had administered when J.W. was admitted. The source of the amphetamines was never identified, but Dr. Hilal agreed that some prescription medications can cause a positive test, although the codeine that likely

caused the positive opiate test would not have caused the positive result for amphetamines. In light of the positive drug tests, the hospital referred the case to the Department.

On April 28, J.W. began showing signs of withdrawal; Dr. Hilal described J.W. as inconsolable, jittery, sweating, hypertonic, not sleeping, and experiencing poor weight gain and loose stool. The hospital began administering morphine on April 30 to treat his symptoms and weaned him off the medication over a ten-day period. The hospital also adjusted his formula to counteract his poor weight gain.

In the meantime, Department investigator Madison Gresset received the referral on April 25 and conducted an initial investigation. When the results of the meconium drug screen came back on May 1, a hospital social worker told Gresset that one of the substances for which J.W. tested positive was methamphetamine, an illegal street drug, but the parties agree that this was a mistake and that neither Mother nor J.W. has ever tested positive for that drug. When Gresset spoke to Father about the test results, he reported that he did not know Mother had used any substances and had no knowledge of how they could have entered her system. He described Mother as a "free spirit . . . coming and going as she pleased" from their home. Gresset attempted to speak to Mother about the results the same day but was unable to locate her at the hospital. The following day, the Department was informed that Mother and Father had an attorney.

On May 17, two days before J.W. was discharged from the hospital, the Department filed for emergency removal and sought

temporary managing conservatorship of J.W.,[2] which the trial court granted. The Department had considered placing J.W. with Father rather than seeking removal, but Father expressed that he was not sure he could act as an independent caregiver for J.W. at that time. Gresset was also troubled by Father's denial of knowledge about Mother's substance use and was concerned that he was missing warning signs and justifying her behavior.

The Department considered and ultimately ruled out several other possible placements suggested by J.W.'s parents. Father's two brothers and a family friend informed the Department that they supported Father but did not want to be considered as placements for J.W. The Department ruled out the household of Cecilia and Cecilio Salas, the mother and brother of Mother's former fiancé who had passed away, because of concerns about a suspected romantic relationship between Mother and Mr. Salas and its effect on the family's ability to be objective about Mother and protective of J.W. Mother and Mr. Salas denied such a relationship, though according to a conservatorship caseworker with the Department, Father had previously described Mr. Salas as being "infatuated" with Mother. Finally, Father proposed that he and J.W. could move in with Mother's sister, Nicole Taylor, and requested that the Department conduct a home study. According to Gresset, the Department had concerns about Taylor's protectiveness

---

[2] Before J.W.'s discharge, the Department had instructed the hospital that contact between the parents and J.W. had to be supervised, at least in part because of the incident involving Mother's taking Doug to prevent his removal.

6

and whether her limited mobility, which was the result of a car accident years earlier, would allow her to be an independent caregiver if necessary. The Department therefore "wanted to have a very thorough look at her home and her home environment" before determining whether she was a viable long-term placement option.

Department supervisor Kelly Allen described the references collected during the home study for Taylor as "indicat[ing] that she would struggle to care for a child based on her own [medical] needs," leading the Department to question whether she could provide an appropriate home for J.W. Allen further testified that Taylor subsequently informed the Department she no longer wanted to be considered as a placement for J.W. because she was concerned that Mother's presence in her home could jeopardize Taylor's visitation rights with her own children, who were in their father's custody. Taylor denied ever withdrawing from consideration as a placement.

J.W. was discharged from the hospital on May 19, and, after failing to find a suitable relative placement, the Department placed him with an unrelated foster family with whom he has lived ever since. Following an adversary hearing held on May 31–June 1, the trial court issued temporary orders naming the Department temporary managing conservator, requiring Mother and Father to comply with the requirements in the Department's service plan, and approving visitation at a minimum of once per week for a two-hour period. Among other things, the service plan required Mother and Father to maintain a safe and stable home environment, submit to random drug tests as requested by the Department, contact Department caseworkers at least twice a

month, attend supervised visits with J.W., complete a psychological evaluation and follow recommendations, and attend individual counseling. Mother was also required to complete inpatient and outpatient drug treatment.

At trial, Department caseworkers testified at length about the parents' actions in relation to the service plan. Mother completed parenting classes, but her attendance at individual counseling sessions was "very poor." She completed a psychological evaluation in February 2018 with Dr. Matthew Ferrara,[3] though he testified that the tests he administered indicated Mother's answers were unreliable and that she exhibited significant positive response bias, meaning she underestimated the scope and intensity of her problems and provided answers in an effort to appear more "virtuous" than she actually is. Mother also missed "quite a few" of the weekly visits with J.W., which she attributed to not wanting to get him sick. As for the required drug testing, Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive.[4] A July 20, 2017 test was positive for methadone, explained by Mother's resumption of

---

[3] Mother initially scheduled a psychological evaluation with Dr. Paul Damin, but she testified that she left his office without seeing him because the receptionist was rude to her. She then scheduled an evaluation with Dr. Ebony Butler, but she left in the middle of the appointment because, according to Mother, Dr. Butler got mad at her and acted unprofessionally.

[4] Mother attributed some of the missed drug tests to conflicts with scheduled visits with J.W. and others to her view that "no matter what I did for the Department, it wasn't going to change anything."

treatment at the methadone clinic after J.W.'s birth, and a February 8, 2018 test was positive for morphine and codeine.[5]

Mother refused to participate in an inpatient drug-treatment program, but she did begin an intensive outpatient program at All About Recovery, a facility in Houston, in July 2017. She was unsuccessfully discharged from the program in late September due to excessive absences. Mother reentered the program in early October, completed all the sessions, and was given a "successful but guarded" discharge in December 2017 based on an incident involving both Mother and Father that occurred after her last session. Specifically, Mother was asked to provide an exit urine sample and was required to be observed by a facility staff member. While waiting for Mother to prepare herself, a staff member observed Father exiting the men's bathroom with a full specimen cup and handing it to Mother, who was exiting the women's bathroom. Mother and Father were told that the facility could not accept the specimen in light of the irregularity, and a counselor testified that Mother and Father left the facility before they could be told that it was still willing to allow Mother to provide a proper sample. Mother and Father denied the incident, and Mother testified that she did not provide another sample because she was told to leave.

---

[5] According to Mother, the February drug test was explained by medication doctors had given her during an emergency-room visit in December 2017. Mother said she was unable to provide records of that visit because she had used her friend's name, as she did not have insurance at the time. When asked about the incident, Mother testified that "my friend was the one that said I was her" and that Mother did not realize what had happened until after she was treated.

As to Father's service plan, the Department agreed that he satisfied several of the requirements. He completed parenting classes and individual counseling,[6] had a stable retirement income, and attended all but two or three of the weekly visits with J.W. The Department waived the requirement that he obtain a psychological evaluation and did not require him to submit to any additional drug testing after his initial negative test. However, the Department's position at trial was that Father failed to comply with the service plan's requirements that he "maintain a safe and stable home environment" and "contact [the Department] caseworker at least twice a month."

With regard to Father's maintaining contact with the Department, Allen testified that his contact was "excellent" during the first few months of the proceedings, but at some point after July 2017 "he would no longer speak to us," apparently at Mother's behest. Allen stated that Mother would answer Father's phone, tell him not to talk to the Department, and hang up. When they came to the Department's office for weekly visits with J.W., Mother would not look at or speak to anyone and would tell Father to "shut up" if he attempted to speak, resulting in "very little meaningful contact" with either parent. Father attributed the change in attitude to the Department's making it clear at a family group conference in July 2017—which Mother did not attend—

⁶ In the court of appeals, the Department argued that Father did not complete the counseling requirements, but the Department does not make that argument in this Court, and we do not consider it.

that its goal was to terminate his and Mother's parental rights.[7] In any event, as noted, Father attended almost all the weekly visits with J.W., which took place at the Department's office.

With respect to maintaining a "safe and stable home environment," the Department discussed the condition of Father's residence, the lack of a concrete plan for independently raising J.W., and Father's ongoing relationship with Mother. Concerns about Father's residence, which Father had owned for approximately forty years, were based on two home visits occurring on May 31, 2017, and June 20, 2018. Gresset conducted the first visit and described the house as being "unsafe for a child." She testified that she could not physically enter some of the rooms because objects "completely overwhelmed all of the surfaces." This included the room in which Mother and Father "had started the process of putting the crib together but there were just innumerable items piled upon each other, making it very difficult to navigate." Gresset also described a hole in the hallway ceiling that had gray and black color around the edge, suggesting water damage. Gresset took photographs of the home that bear out her description and show rooms overflowing with trash, loose cables, clothes, and other miscellaneous household items, including an ashtray filled with cigarette butts indicating smoking in the house was a common

_____

[7] Allen testified that the Department's "primary" goal was unrelated adoption; that its "concurrent" goal, which "the Department works simultaneously," was family reunification; and that the goals can switch during the proceedings if the parents make progress. She stated that this was explained at the family group conference.

11

occurrence.  Gresset did not observe anything that she would consider a "biohazard," such as fecal matter or insects.

Department caseworker Jennifer Smith visited the residence in June 2018, approximately four months before trial.  At trial, she was shown the photographs from the previous visit, which she described as showing the house to be unsafe for a young child, and she stated that Father had done nothing to address those issues.  She also noted being "hit with an overwhelming odor of stale cigarette smoke as well as fresh cigarette smoke" when she entered the home and observed an ashtray filled with cigarette butts apparently belonging to Mother.  Smith believed it was "unrealistic" to think J.W. would never be in the home if Father regained custody, so she offered to walk through the home with him and make suggestions about how to make it safe for a toddler. Father declined and did not permit her to take photographs of the house.

Father did not contend at trial that his home was suitable or safe for a child.  Rather, he testified that he and Mother had never intended to raise J.W. in that home and that, even before J.W. was born, they intended to live with him and raise him in Taylor's apartment.  He stated that this had been the plan throughout the proceedings and that the Department had been aware of it since before J.W. was discharged from the hospital.  Father further testified that he and Mother had filed for divorce the week before trial in order to give Mother a fresh start in Houston, where she had been living with the Salas family, and to give Father a chance to be a father to J.W.  He explained that his plan was to reside temporarily at Taylor's apartment with J.W. while he sold his house, and then move to the Fort Worth area to be close to his family.

12

He also testified that Mother loves J.W., has "kind of got her life back together," and has been sober for a long time, but that he would not allow J.W. to be around her if he believed she was under the influence of anything.

The Department's witnesses disputed both whether there had been a consistent plan to raise J.W. in a safe environment and whether Father had demonstrated his ability to put J.W.'s needs above Mother's. Gresset testified that at the beginning of the investigation, her understanding was that Mother and Father lived together in the home Father owned, and she had no reason to believe they intended to raise J.W. anywhere other than that home before the Department got involved. Taylor testified that discussions with Mother and Father about Taylor's assisting them with J.W. and being a possible placement began a few weeks after J.W. was born, calling into question Father's assertion that they had planned to move in with Taylor all along. And as noted, Allen testified that Taylor had withdrawn from consideration as a placement earlier in the proceedings, though Taylor disputed that assertion and testified that she was still open to letting Father and J.W. move in with her.

The Department also discussed ongoing uncertainty about Mother's and Father's living arrangements over the course of the proceedings and whether their planned divorce was "in name only." Wendy Arline, a Department courtesy worker who assisted with setting up services for Mother in Houston, testified that scheduling issues had arisen because the parents sometimes reported they lived in Houston and sometimes reported they lived in College Station. Mother had

reportedly been living in Houston with the Salas family for over a year at the time of trial but was not listed on their apartment lease and was seeing a therapist in College Station. Mother reported to the Department in April 2018 that she and Father planned to get a divorce, but Father also reported that they continued to spend nights under the same roof on a regular basis. On June 15, 2018, Arline made an unannounced visit to the apartment where Mother lived with the Salas family, and Father answered the door "look[ing] like he had just woke[n] up." Five days later, Smith visited Father's residence in College Station, and he informed her that Mother had been there earlier that day and had just left to go back to Houston. He also stated that he was Mother's primary source of transportation.

Allen described additional instability with respect to Father's living situation and plans for J.W. When questioned whether Father had continually expressed his intent to live with J.W. at Taylor's home, Allen replied:

> It's actually the opposite of that, and – and it does go towards stable home. [Father] has said his home would be his primary residence with the child. He's indicated that the home of Nicole Taylor, [Mother's] sister would [be] the primary residence. He has said that he will move into a home near his brother's in the North Texas area.
>
> So in fact he has given us numerous possible locations where he and the child will live, but has never made any steps to prepare these homes to live there. And in fact on Friday when he indicated he would be living possibly with Nicole, who is [Mother's] sister, when we asked to see the home he said the room still wasn't ready.

Allen further noted that Father "had tons of character witnesses who would drop anything and do anything for him" but "18 months into the

case, his house is in disarray, he doesn't have a solid plan for where the baby is going to go, he doesn't . . . have a car . . . to put the baby in." The concern about Father's car was that it remained full of trash, bottles, and choking hazards and was so cluttered that, according to Smith, it did not appear that "a car seat could even be put in the back seat of the car for the child." The back windshield, which Father explained had been hit by a pellet while he was driving on the highway about a month before trial, remained "completely broken and crushed in," with glass shards on the inside of the car.

Smith also discussed a visit with Father at her office on October 5, 2018, only a few days before trial. Father was "very friendly" as he always was, but their conversation left her with "some concerns." Specifically, Father stated that he "feels a very strong calling to help" Mother and remains her primary source of transportation even though she lives in Houston. They discussed an incident that occurred in March 2017, approximately one month before J.W.'s birth, in which Father allowed a friend of Mother's who had recently been released from prison to stay in their home because, although he "was not crazy about the idea," he "didn't have the heart to tell her no." While staying with them, Mother's friend "overdosed on something" and had to be taken to the emergency room. Father similarly reported allowing a "friend of a friend" of Mother's, who Father believed had just gotten out of jail, to stay in his home over the preceding summer because, again, he "didn't really have the heart to tell her no."

According to Smith, Father also reported that Mother had told him she wanted to have more children with him in the future and that

"he told her that they had to wait until after this case was done." This conversation caused Smith to question whether Father genuinely intended to separate from Mother and whether he could adequately protect J.W. given his knowledge of Mother's history, the circumstances surrounding J.W.'s birth, and Mother's continuing issues. Father recalled the conversation with Smith differently, testifying that he and Mother intended to finalize the divorce, that he knew a new case could be opened against him if he regained custody of J.W. and failed to protect him, and that he had no plans to have more children with Mother. Mother similarly testified that she wanted Father to have the opportunity to raise J.W. and that she could and would "stay away" if he told her to.

Father's discharge summary from his counseling sessions in the spring of 2018 also contributed to the Department's concerns about his ability to protect J.W. Father's counselor testified that in her view, Father believed whatever Mother told him, minimized her drug use, and made excuses for her behavior. Consistent with that pattern, Smith noted that during her visit to his home in June 2018, Father stated that he did not believe Mother posed any danger to J.W. and that the Department had been called initially only because of Mother's history with her older children. When asked about the fact that J.W. tested positive for opiates when he was born, Father reportedly said that it had been "a very slight issue," that "the doctor said it was moderate," and that J.W. had been fine after a three-day hospitalization. Father denied this description of the conversation, testifying that he did not

16

characterize the incident as a "slight issue" and reported only what the doctor had told him about J.W.'s symptoms being moderate.

In addition to disputing some of the caseworkers' testimony about the course of events after the Department got involved, Father presented several witnesses who testified about his character. By those accounts, Father has a history of volunteering for charitable causes, including the Boys and Girls Club. Friends and family testified that he was happy and excited about being a father and that they believe he would be a good parent and would be protective of J.W. And Father's brother testified that if Father moved to the Fort Worth area with J.W., the family would be supportive and would help them find a place to live.

J.W.'s foster mother testified that in her interactions with Father, he had been very kind and genuinely interested in J.W.'s health and welfare. She testified that she loves J.W., that she and her husband are willing to adopt him, and that she wants what is best for him. She also said that regardless of the result, she believes it is important for J.W. to have the opportunity to know Mother and Father if he wishes. Father similarly testified that if J.W. were returned to him and the foster parents "wanted to see [him] some time, . . . that would be fine."

Summarizing her opinion that termination of Father's parental rights would be in J.W.'s best interest, Smith explained:

> I believe that in terminating [Father's] parental rights, [J.W.] would be able to be in an environment that is safe and appropriate where he is protected; where his needs are not only met but placed first; where his social and emotional needs are met; where he's kept safe from drug use, criminal involvement, even elements in his environment that can be dangerous to him. I believe that

17

it is in his best interest to be in an environment that will keep him safe.

The Court Appointed Special Advocate (CASA) assigned to J.W.'s case also testified that she believed termination was in J.W.'s best interest. She explained that she did not "say that lightly" because "they're loving parents, but they're not capable of taking care of this child adequately in my opinion."

At the conclusion of the five-day trial, the jury was asked two broad-form questions: whether the parent–child relationship between Mother and J.W. should be terminated and whether the parent–child relationship between Father and J.W. should be terminated. The jury was instructed that to terminate the relationship as to Father, it had to find by clear and convincing evidence that termination was in J.W.'s best interest and that "at least one of the following events has occurred": (1) Father knowingly placed or knowingly allowed J.W. to remain in conditions or surroundings that endanger his physical or emotional well-being, *see* TEX. FAM. CODE § 161.001(b)(1)(D); (2) Father engaged in conduct or knowingly placed J.W. with persons who engaged in conduct that endangers his physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and (3) Father failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of J.W. who has been in the temporary managing conservatorship of the Department for not less than nine months as the result of his removal under Chapter 262 of the Family Code, *see id.* § 161.001(b)(1)(O). The jury was instructed similarly as to Mother, although two additional predicate grounds—involving prior termination of parental rights as to another child on endangerment grounds and use

18

of a controlled substance in a manner that endangered J.W.'s health or safety—were also submitted for the jury's consideration.

Father objected to the broad-form submission; that is, he objected to the three predicate grounds and best interest "being lumped together" into a single question. The trial court overruled that objection, and the jury found by clear and convincing evidence that both parents' rights should be terminated. Consistent with that verdict, the trial court rendered a final order of termination.

Father appealed, arguing the evidence was insufficient to support the jury's findings as to the three predicate grounds as well as the jury's best-interest finding. Father presented as an alternative issue that "if there is evidence to support the jury's predicate finding under one ground, the Court must nonetheless reverse and remand for a new trial, as Father objected to the trial court's broad-form submission because there was no evidence to support at least one predicate." Mother's attorney filed a detailed *Anders* brief in the court of appeals, stating that after a thorough examination of the record for any potentially meritorious issues, she had identified no nonfrivolous issue to raise in the appeal. The court of appeals affirmed as to both parents. That judgment is final as to Mother, who did not petition this Court for review.

With respect to Father, the court of appeals initially held that the evidence was legally sufficient to support the best-interest finding and to support the predicate ground under Section 161.001(b)(1)(O)—failure to comply with a court order that established the actions necessary to obtain J.W.'s return. 2019 WL 1966798, at *4–6 (Tex. App.—Waco May

19

1, 2019). Because only one predicate ground is necessary to support a judgment for termination, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), the court of appeals did not address Father's sufficiency challenges to the two predicate grounds under Subsections (D) and (E) involving endangerment, *see* 2019 WL 1966798, at *4. The court of appeals also did not address Father's assertion that the trial court erred in submitting a broad-form charge to the jury, holding that the issue was inadequately briefed. *Id.* at *7.

Shortly after the court of appeals issued its opinion, this Court decided *In re N.G.*, 577 S.W.3d 230 (Tex. 2019). In that case, we held that due process requires appellate review of a challenged finding under Section 161.001(b)(1)(D) or (E), even if sufficient evidence supports a different predicate termination ground, because of the potential consequences of a Subsection (D) or (E) finding with respect to parental rights to a different child. *Id.* at 235; *see* TEX. FAM. CODE § 161.001(b)(1)(M), (b)(2) (providing for termination of parental rights if the court finds by clear and convincing evidence that (1) the parent's rights to another child were terminated based on a finding under Subsection (D) or (E) and (2) termination is in the child's best interest). In light of that intervening change in the law, the court of appeals granted Father's motion for rehearing and issued a substituted opinion. 627 S.W.3d 662, 665 (Tex. App.—Waco 2019).

In its opinion on rehearing, the court of appeals again held that legally sufficient evidence supported the Subsection (O) ground and the jury's best-interest finding. *Id.* at 671, 673. The court further held that legally sufficient evidence supported termination under Subsections (D)

20

and (E). *Id.* at 672. Because the court of appeals concluded that the evidence was sufficient to support all three predicate grounds submitted to the jury, it did not address Father's argument that the trial court's broad-form submission was reversible error. *Id.* at 673. We granted Father's petition for review.

## II. Standard of Review

A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Accordingly, to terminate that right, the State must meet a clear-and-convincing burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); TEX. FAM. CODE § 161.001(b); *see also id.* § 101.007 (defining "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established").

This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal. To that end, in reviewing a legal-sufficiency challenge, we must determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Bearing in mind the required appellate deference to the factfinder, we "look at all the evidence in the light most favorable to the finding," "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* However, we may not disregard "undisputed facts that do not support

21

the finding." *Id.* Under this standard, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)).

## III. Discussion

A court may terminate a parent's right to his child if it finds by clear and convincing evidence both that (1) the parent committed an act prohibited under Texas Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The three predicate grounds under Section 161.001(b)(1) at issue here are:

> (D) [the parent has] knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) [the parent has] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [and]
>
>     . . . .
>
> (O) [the parent has] failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O). Father argues that the evidence at trial was legally insufficient to support any of those

predicate grounds as well as legally insufficient to support the finding that termination of his parental rights was in J.W.'s best interest.

## A. Failure to Comply with Service Plan

We first address Father's assertion that the evidence is legally insufficient to support termination under Subsection (O), which applies when a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* § 161.001(b)(1)(O). Father does not dispute that J.W. has been in the temporary managing conservatorship of the Department for not less than nine months as the result of his removal under Chapter 262. Nor does Father assert that the trial court's order incorporating the family service plan did not specifically establish the actions necessary for him to obtain J.W.'s return. Rather, Father contends that the Department "relied on things that were not actually part of his service plan to show noncompliance."

As discussed, Father completed several of his service-plan requirements, including establishing paternity, submitting to random drug testing, signing releases of records, maintaining a steady income, completing a parenting assessment, attending visits with J.W., and attending counseling. But he did not, according to the Department, "maintain a safe and stable home environment" or contact the Department at least twice a month. On the record before us, we agree with the Department that a reasonable juror could have formed a firm

23

belief or conviction that Father failed to maintain a safe and stable home environment and thus failed to comply with the service plan.[8]

Beginning with the condition of Father's home, which the Department visited shortly after J.W. was removed and again a few months before trial, two caseworkers testified in detail that the home was unsafe and unsuitable for a child. That testimony and the accompanying photographic evidence are described above, and, again, Father made no effort at trial to refute it. Instead, Father asserts that the Department was well aware of Father's plan to live elsewhere with J.W.—rendering the condition of his home "irrelevant"[9]—and gave him no indication that it disapproved of his plan. Nor, Father asserts, did any Department witnesses testify that they thought Father was untruthful about his intentions. Father characterizes the evidence as demonstrating that he had a concrete plan for raising J.W. in a stable environment and that the Department secretly and subjectively determined that the plan was insufficient. The Department responds that the requirement to maintain a safe and stable home was not a prospective one and that at the time of trial, the intended safe and stable home "simply did not exist." The Department further contends that the jury was free to disbelieve Father's testimony that he intended to move out of the home in which he had resided for forty years or "to infer that

---

[8] We need not address the parties' dispute about whether Father maintained insufficient contact with the Department.

[9] JUSTICE BLACKLOCK's dissent concludes that Father did not waive the argument that his residence was in fact safe and stable. *Post* at 9 n.3 (Blacklock, J., dissenting). Regardless, the evidence supports the jury's contrary conclusion.

24

his behavior of creating a hazardous home would move with him" to his next home.

The record reveals that the jury was presented with ample evidence undermining the stability of Father's plans for raising J.W., including where Father intended to live, his ability to independently parent J.W., and the nature of his continuing relationship with Mother, whose parental rights the jury also found should be terminated. For example, Father testified that he and Mother never intended to raise J.W. in the home that the Department considered to be unsafe for a child and that they had always planned to move in with Taylor after he was born. But the testimony of both the caseworkers and Taylor suggests otherwise. Taylor testified that discussions about moving in with her began after J.W.'s removal, and conflicting evidence was presented as to whether Taylor withdrew from consideration as a placement earlier in the proceedings. Although she testified at trial that she was willing to allow Father and J.W. to move in with her, and Father testified that this was the plan, the Department still had not been permitted to inspect her apartment. At the time of trial, Father remained in the same home in which he had lived for forty years and had provided no indication that he could maintain any future residence in a manner safe for a child. Even the car in which he presumably intended to transport J.W. had a broken back windshield and too much trash inside to allow for a car seat.

Father's intentions regarding Mother's continued involvement in raising J.W. also remained murky at best at the time of trial, which was particularly concerning in light of Father's own statements of uncertainty regarding his ability to independently parent J.W. Mother

and Father filed for divorce the week before trial and, according to one caseworker, Father reported that he had told Mother they needed to "wait until after this case was done" to consider having more children. Based on her observations, the caseworker testified that she "believe[d] a reasonable person would see that they're still in a relationship."

The Department also presented evidence that Father continued to downplay Mother's dependency issues and their impact on J.W. This included Father's participation in the incident at All About Recovery in which he attempted to assist Mother in faking a drug test during the pendency of the termination proceedings. Father's counselor testified that Father essentially believed whatever Mother told him, while Mother's psychological evaluation indicated she underestimates the scope and intensity of her problems. Smith also testified that Mother and Father were in a "very controlling relationship," as evidenced by Mother's refusal to allow him to speak to the caseworkers when they visited J.W. Mother and Father pointed to their impending divorce as evidence that Father wanted a fresh start with J.W. But other evidence described above indicated a lack of candor with the Department and the court: that they did not intend to separate, they were still in a relationship, and the divorce was "in name only."

Father's continued association with Mother was not inherently problematic so long as there was evidence indicating Father could ensure J.W.'s safety. But Father presented the divorce to the jury for just that purpose: to address the perception of his inability "to tell her no" given the Department's concern "about the people she would bring around, the people he wouldn't be able to protect not only himself from

26

but also his child." Thus, if the jury believed the divorce was not genuine, then it both called Father's overall credibility into question and demonstrated that the divorce could not serve its purported purpose.[10]

Nor were the Department's underlying concerns unjustified. Smith described a string of incidents ranging from a year before J.W. was born to the summer before the termination trial. The first incident occurred in April 2016 and involved a man named Mario Garcia, the same man Mother had once named as J.W.'s father on an application for government assistance and, according to Father, "a ten time felon." Father was forced to call law enforcement when Garcia would not leave his and Mother's home. About a week later, Mother texted Father that she was at a Walmart with Garcia and wanted Father to pick her up. When Father arrived, Mother would not leave with him, and law enforcement was called. Garcia told the police (falsely) that Father had been abusing Mother, and she said nothing; this led to Father's being arrested and spending the night in jail, as well as entry of a protective

---

[10] To be clear, we certainly do not hold that Father was required to divorce Mother in order to comply with the service plan, nor do we take the Department's position to be that Father could only maintain a safe and stable home environment for J.W. by getting a divorce. Rather, as noted, Father and Mother presented their pending divorce to both the Department and the jury as evidence that Father was willing and able to put J.W.'s needs above Mother's, and neither the Department nor the jury was persuaded. If Father was misrepresenting his intentions and the divorce was illusory, then other evidence was necessary to demonstrate Father's ability to protect the child. In other words, regardless of whether Father and Mother intended to live together after the conclusion of this litigation, Father was required to provide a safe and stable home for J.W., and the jury found that he did not. Had the jury been persuaded that Father would take adequate steps to ensure J.W.'s safety even if he and Mother continued to live together, the outcome may well have been different.

order that required him to leave the house for a brief period. Mother subsequently told the police she did not want to file charges, and the case was dismissed. A few months later, in August 2016, Father called law enforcement again when he discovered Mother had allowed Garcia back into their home and he "had a knife open." That incident was followed in March 2017—when Mother was eight months pregnant—by the above-described episode involving Mother's friend who had recently been released from jail and overdosed while staying in Mother and Father's home. And in the summer of 2018, after he and Mother had expressed their intent to get a divorce, Father again allowed a recently jailed friend of Mother's to stay in his home.

Father dismisses those events as "isolated incidents" that occurred "long before J.W. was born." We agree that Father's conduct before J.W. was born cannot demonstrate failure to comply with a service plan generated after he was born. However, those incidents— including the most recent that occurred the summer before trial— provide context for a pattern that continued throughout the termination proceedings. We cannot reject as unreasonable the Department's observation that those events, along with other evidence, are consistent with the opinion that:

> [Father] shows a pattern of behavior of denial about the extent and the issues that [Mother] has even with his knowledge of her addiction issues with her mental health issues, the fact that she refuses to get help, the fact that there's a criminal element that's around who's involved with drugs, the fact that he can't seem to protect himself much less a child from the pattern of behaviors that she brings and he's not willing to address those.

28

The jury was thus presented with evidence supporting the Department's conclusion that Father had not maintained a safe and stable home environment, did not have a concrete plan for providing one for J.W., and had not taken practical steps to bring any such plan to fruition. Giving appropriate deference to the jury's resolution of conflicts in the evidence, including witness credibility, we hold that the jury reasonably could have formed a firm belief or conviction that Father failed to maintain a safe and stable home environment, as his service plan required, and thus "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." TEX. FAM. CODE § 161.001(b)(1)(O).

JUSTICE BLACKLOCK's dissent accuses both the Department and this Court of relying on suspicion about Father's future actions and intentions rather than the actions he actually took with respect to maintaining a safe and stable home environment. *Post* at 4–6 (Blacklock, J., dissenting). In the dissent's view, the crux of the dispute is the availability of Taylor's clean and safe home, and the evidence points to no other possible conclusion than that Taylor's home was safe and available and that Father had maintained a consistent, concrete plan to utilize that home and then "explore moving to Fort Worth" with J.W. *Id.* at 10. We disagree on several fronts.

29

First, while the elevated burden of proof was certainly on the Department, the responsibility to weigh evidence, draw inferences, and evaluate witness credibility was on the jury. No one argues, and we do not hold, that the evidence conclusively establishes Father's failure to maintain a safe and stable home environment during the pendency of the proceedings, as the service plan required. The jury could have chosen, as the dissent does, to credit Father's and Taylor's testimony on the subject and to draw inferences in Father's favor. But the jury was not required to do so, particularly in the face of evidence that reasonably led it to discount that testimony.

To that end, the dissent argues that inconsistencies regarding whether Father ever intended to raise J.W. in his home, whether Taylor ever withdrew as a possible placement, whether the Department has inspected Taylor's home, and the current condition of Father's residence and vehicle have no bearing on whether Taylor's home is "presently available." *Id.* at 10–14. But these inconsistencies raise significant credibility issues—as to both Father and Taylor—regarding whether Father had an *actual* plan that he had taken *actual* steps to implement. Indeed, if nothing else, as JUSTICE BOYD's dissent notes, the evidence that Father attempted to help Mother fake the results of a drug test (and his denial of the event) could reasonably have led the jury to doubt Father's entire testimony. *Post* at 5 (Boyd, J., dissenting); *see In re J.F.-G.*, 627 S.W.3d at 312 (holding that the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor"). Moreover, Father's specific testimony about his living situation was contradicted by, among other things, Department witness Kelly Allen's testimony that over the

30

course of the proceedings, Father had given "numerous possible locations where he and [J.W.] will live, but has never made any steps to prepare these homes to live there." She continued that Father indicated on the Friday before trial that "he would be living possibly with [Taylor]" and that when the Department "asked to see the home he said the room still wasn't ready." Of course, "unready" does not necessarily equate to "unsafe," *post* at 12–13 (Blacklock, J., dissenting), but it is entirely consistent with the Department's view about the stability of the home Father planned to provide J.W.

The service plan required Father to "maintain," in the present, a "safe and stable home environment." While JUSTICE BLACKLOCK's dissent opines that we must impermissibly speculate about Father's intent in order to conclude that he failed to do so, it is the dissent who ignores the evidence of Father's conduct throughout the proceedings (or at least, chooses to believe Father's account rather than the Department's) and instead speculates that Father will be able to provide a safe and stable home environment for J.W. in the future. On the record presented, drawing all credibility determinations and reasonable inferences in favor of the jury's verdict, rather than against it, the jury reasonably could have concluded by clear and convincing evidence that the only "home environment" Father had ever maintained was a residence that was unsafe for a child.

The dissent also discounts the evidence regarding Father's actions with respect to Mother as irrelevant to the requirement that he maintain a safe and stable home environment. Again, the dissent accuses us of speculating that Father will not provide a safe home

31

environment in the future, but it is the dissent who engages in speculation. The jury heard evidence that Mother's own conduct contributed to making Father's home unsafe, that Father minimized her problems and could not "tell her no" (to the point that he helped her fake a drug test and reportedly assented to having more children with her after the "case was done"), and that Father was either unable or unwilling to put J.W.'s needs above Mother's. The dissent believes Father's testimony to the contrary; the jury did not.[11]

## B. Best Interest

Father next argues that he is entitled to rendition of judgment because legally insufficient evidence supports the jury's finding that termination of his parental rights is in J.W.'s best interest. The best-interest prong of the termination inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We have identified several nonexclusive factors that guide the inquiry, including: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best

---

[11] The dissent's reductionist statement that Father's rights to his child were terminated because "he cares too much for his wayward wife" and "does not take out the trash" is certainly catchy, *post* at 26 (Blacklock, J., dissenting), but it does not come close to encapsulating the evidence that was presented to the jury over the course of the five-day trial. Courts may not overlook conduct that subjects a child to serious risks merely by characterizing it as conduct that supports a "wayward" spouse.

32

interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The jury charge listed these factors for the jury's consideration in determining J.W.'s best interest.

In holding the evidence was sufficient to support the best-interest finding, the court of appeals noted that: J.W. has been with his foster family since he was released from the hospital; his physical and emotional needs are being met by the family, who plan to adopt in the event the parents' rights are terminated; the foster parents have a family support system; the jury heard evidence that Father is not able to place J.W.'s needs above Mother's and that he allows Mother to control him; since getting involved with Mother, Father has allowed persons to live in his home who abused drugs and was arrested after the incident with Mother and Garcia; and evidence was presented indicating that the divorce, which Father himself presented as a justification for maintaining his parental rights, was "in name only." 627 S.W.3d at 673.

Father notes the undisputed evidence that he has an upstanding character, volunteers, helps people in need, is even-tempered and patient, and has a solid support system of family and friends. As to the *Holley* best-interest factors, Father summarily asserts that the only factor now weighing in favor of termination is the length of time J.W. has been with a foster family with whom he should never have been placed. On a more general level, Father asserts that "'[l]ack of

protectiveness' has become a problematic mantra . . . to justify cutting off children from their parents and village of family and caregivers in favor of unrelated placements" and that the Department failed to meet the stringent requirements necessary to justify placing a child in an unrelated home rather than with parents or a kinship. *See* TEX. FAM. CODE §§ 261.307, 262.1095, 262.114(d). Father continues that this rejection of any possible kinship placement "based on unfounded fears Mother may attempt to interject herself into his life at some point (while ignoring that J.W. has a loving parent and is fortunate enough to have a village of extended family and fictive kin that would support him), is the antithesis of the child-centered focus of the best-interest inquiry."

As an initial matter, we disagree with Father's premise regarding J.W.'s placement and note that Father did not seek relief from the trial court's temporary order following the initial adversary hearing, in which the trial court found that J.W. should not be returned to his parents. *See id.* § 262.201(g) (requiring the trial court, at the conclusion of a full adversary hearing following a child's emergency removal, to return the child to the parent unless sufficient evidence shows, among other things, that "there is a substantial risk of a continuing danger if the child is returned home"); *see also In re T.M.*, No. 14-20-00703-CV, 2021 WL 865363, at *4–5 (Tex. App.—Houston [14th Dist.] Mar. 9, 2021, orig. proceeding) (granting mandamus relief from the trial court's order declining to return the child to the parents due to insufficient evidence of the court's findings under Section 262.201(g)). Moreover, Father overstates the evidence that he claims demonstrates a vague and

34

unsupported "lack of protectiveness" justification for any placement suggested by the parents.

As to Father himself, caseworker Gresset testified that when J.W. was removed, Father informed the Department he did not think he could independently parent J.W. at that time, and Gresset was concerned about Father's expressed lack of knowledge about Mother's substance abuse. As the investigation continued, the Department discovered additional information, described above, regarding the condition of Father's home, the risks posed by Mother's presence, and the status and nature of Mother and Father's relationship. Father faults the Department for failing to explain why it did not consider or conduct a home study on his family in Fort Worth, but he wholly disregards Gresset's testimony that the family members took themselves out of consideration as placements for J.W. With respect to Mother's sister, the Department's home study raised concerns about her ability to meet a child's needs, and a caseworker testified that she too withdrew her name from consideration as a placement. Finally, the Salas family was ruled out because of concerns about a romantic relationship between Mother and a member of the Salas household. Moreover, Mrs. Salas testified that Mother had been living with them for a little over a year at the time of trial, and we cannot fault the Department for declining to place J.W. with Mother.

Importantly, given the child-centered focus of the best-interest inquiry, we may not discount or minimize the level of permanence J.W. has achieved with his foster family, with whom he has lived since he was a month old. We will not recount the above-described evidence in detail,

35

but the same evidence that supports termination of Father's rights under Subsection (O) also supports the best-interest finding. *See In re J.F.C.*, 96 S.W.3d at 275 (noting that "most of the evidence relevant to the best interest of the children was also relevant to the grounds for termination based on the parents' conduct set forth in the charge"). Considering the evidence in the light most favorable to the jury's best-interest finding, we agree with the court of appeals that the evidence is legally sufficient to support that finding.

We certainly do not condone or make light of the potential, highlighted by Father, for the Department to summarily dismiss all kinship placement options in a "quest to punish a parent" rather than serve the best interest of the child. Such behavior threatens to unjustifiably invade a parent's due process rights and would violate both federal and state law. *See* 42 U.S.C. § 671(a)(19) (requiring states, as a condition of eligibility for federal funding, to consider giving preference to an adult relative over an unrelated caregiver when determining a placement for a child, "provided that the relative caregiver meets all relevant State child protection standards"), (29) (requiring the State to notify certain relatives about the child's removal and possible participation in the child's placement); TEX. FAM. CODE §§ 261.307(a)(2)(A)(ii) (requiring the Department, if it determines removal may be warranted, to provide the parent a proposed child-placement resources form to identify potential relative or other designated caregivers), 262.114(d) (requiring the Department to give preference to the child's relatives in making a placement decision).

However, we cannot conclude on the record before us that that is what happened here.

## C. Endangerment

Although legally sufficient evidence supports the Subsection (O) ground and best interest, and only one predicate ground is necessary to support a judgment for termination, *In re A.V.*, 113 S.W.3d at 362, we may not bypass Father's evidentiary challenges to Subsections (D) and (E), the so-called endangerment grounds. Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to *another* child. TEX. FAM. CODE § 161.001(b)(1)(M); *see In re N.G.*, 577 S.W.3d at 237 (holding that due process mandates appellate review of Subsection (D) and (E) findings when the parent has preserved the issue regardless of whether the termination judgment could be affirmed on another ground). Further, Father argues that if legally insufficient evidence supports any one termination ground, the case must be remanded for a new trial because the trial court erroneously submitted a broad-form termination question, to which Father objected, and we thus cannot determine from the charge whether the jury terminated his rights on an invalid ground. Accordingly, we next address the evidence of endangerment.

We have said that to "endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it does not require that there be conduct "directed at the child" or that "the child actually suffer[] injury." *Id.* The court of appeals

held that the evidence was sufficient to support the endangerment grounds because it showed that Mother used illegal substances while pregnant with J.W., Father was aware of her dependency issues but exhibited a pattern of denial and minimization of those issues, and Father was unwilling to address the danger Mother posed.  627 S.W.3d at 672.

We begin with Subsection (D), which focuses on the child's environment and may be utilized as a ground for termination when the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child."  TEX. FAM. CODE § 161.001(b)(1)(D); *see In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. denied) (noting that Subsection (D) "permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment").  While we have had little occasion to address Subsection (D), the courts of appeals have held that the relevant time frame for evaluating this ground is before the child's removal "since conditions or surroundings cannot endanger a child unless that child is exposed to them."  *E.g., In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *see also In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.); *In re J.A.J.*, 225 S.W.3d 621, 627 (Tex. App.—Houston [14th Dist.] 2006) (noting that under Subsection (D), "it must be the environment itself that causes the child's physical or emotional well-being to be endangered"), *rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007).  As a general matter, we

agree with that reasoning.[12] The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry. *In re R.S.-T.*, 522 S.W.3d at 108–09. Moreover, evidence that a parent will knowingly expose the child to a dangerous environment in the future, while relevant to a best-interest determination, is not proof that the parent has knowingly exposed the child to a dangerous environment in the past for Subsection (D) purposes. *In re J.R.*, 171 S.W.3d 558, 570 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

In this case, J.W. was hospitalized immediately after his birth, and he was removed and placed with an unrelated foster family upon his discharge from the hospital. Both Mother and Father have had only supervised visits with him since his birth and have had no say in his living conditions. Accordingly, to support the jury's Subsection (D) finding, the Department necessarily relies on Father's role in J.W.'s "environment" before he was born. Certainly, *Mother's* use of controlled substances while pregnant created a dangerous environment for J.W., but the extent to which *Father* bears responsibility for that environment is a much more difficult question.

---

[12] To the extent the courts of appeals hold that a parent could never cause his child to be placed in an endangering environment after removal, we disagree, as we cannot foreclose the possibility that Subsection (D) could apply post-removal depending on the facts. But typically, a parent whose child has been removed and who has only supervised visitation has no control over the child's environment, and the parent's conduct during that time will thus be unrelated to Subsection (D).

While we have not yet addressed this issue, several courts of appeals have held that a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and thus support an endangerment finding. *See, e.g.*, *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at \*5 (Tex. App.—Texarkana June 19, 2018, no pet.) (affirming Subsection (E) finding where the father was aware of the mother's drug use during pregnancy and the effects it could have on the child's well-being, and neither reported her to the Department or the police nor made an effort to ensure that she received substance-abuse treatment); *In re J.W.S.*, No. 06-14-00018-CV, 2014 WL 3013352, at \*6 (Tex. App.—Texarkana July 2, 2014, no pet.) (holding that the evidence was sufficient for the trial court to find endangering conduct where the father knew of the mother's drug use during the pregnancy but did nothing to stop it). We agree, as holding otherwise would effectively endorse a parent's willful ignorance of the significant risk that a pregnant mother's drug use poses, which we decline to do. But neither do we endorse attributing any and all known dangers posed to a child during the mother's pregnancy to the other parent. As is often the case in parental-termination proceedings, the inquiry is necessarily dependent on the facts and circumstances.[13]

---

[13] Of course, if a parent actively participates in creating or maintaining a dangerous environment during the pregnancy, e.g., does drugs with the pregnant mother, encourages her drug use, or supplies drugs, we see no reason why such conduct would not qualify as endangerment under Subsection (D). That is not the kind of conduct at issue here.

Indeed, Father does not disclaim all responsibility for J.W.'s well-being during Mother's pregnancy; rather, he posits that the above-described cases imputing endangering conditions or conduct involving drug use by one parent to the other "involve the *opposite* of this case, i.e., where the parent knows that another parent's drug use might be endangering but does nothing to help." Here, Father asserts, he "did everything he could to assist pregnant Mother in her quest [to] overcome addiction."

Whether or not Father did "everything he could," he made what can only be described as a concerted effort to help Mother address her addiction under the circumstances. When Mother informed him of her problem, he searched extensively for a facility that would accept pregnant women, only for Mother to unexpectedly leave the facility before completing the program. When she returned to Texas, Father had already begun a work-related project in Houston, and she initially joined him until his hours escalated considerably. After completing the project, Father again searched for a facility for Mother and, when she was accepted to the methadone clinic, drove her from College Station to Houston every day for several weeks to receive treatment. On this record, the jurors may have reasonably concluded that Father could have better handled the difficult situation into which he was thrust by Mother's addiction, but they could not have reasonably concluded by clear and convincing evidence that Father disregarded his parental obligations to the degree that he knowingly "allowed" J.W. to be placed or remain in a dangerous environment.

Unlike the evidence relating to Subsection (O), which hinged largely on credibility determinations in the face of conflicting evidence, the evidence relating to Subsection (D) was straightforward and conclusively insufficient to justify termination on that ground. Because legally insufficient evidence supports the jury's finding that Father's rights should be terminated under Subsection (D), the trial court erred in submitting that invalid ground to the jury. We thus turn to the effect of that error on the termination judgment's viability.

### D. Broad-Form Submission

Father argues that in light of his objection to the submission of all three predicate grounds in a broad-form jury question,[14] legally insufficient evidence of any one ground requires reversal and remand for a new trial. He cites *Harris County v. Smith*, in which we held that the trial court erred by submitting a broad-form question on damages that included an element without any evidentiary support. 96 S.W.3d 230, 231 (Tex. 2002). Our holding in *Harris County* followed *Crown Life Insurance Co. v. Casteel*, in which we held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." 22 S.W.3d 378, 389 (Tex. 2000). Applying *Casteel*, we held that the charge

---

[14] Again, the jury was instructed that in order to terminate, it had to find by clear and convincing evidence that "at least one" of the three statutory grounds was satisfied and that termination was in J.W.'s best interest.

error in *Harris County* was harmful because, under the circumstances, the appellate court was prevented "from determining 'whether the jury based its verdict on an improperly submitted invalid' element of damage." 96 S.W.3d at 234 (quoting *Casteel*, 22 S.W.3d at 388).

Here, the broad-form charge erroneously, and over Father's objection,[15] commingled a valid termination ground supported by sufficient evidence (Subsection (O)) with an invalid termination ground supported by legally insufficient evidence (Subsection (D)). We reaffirmed in *Harris County* that the right to a fair trial includes "a jury properly instructed on the issues 'authorized and supported by the law governing the case.'" *Id.* (quoting *Casteel*, 22 S.W.3d at 389). In a case involving termination of parental rights, the "'death penalty' of civil cases," the importance of safeguarding a parent's right to a fair trial is even more pronounced. *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring).

Recent revisions to our jury-charge rules in the context of parental-termination proceedings highlight these concerns. Generally, our rules require submission of broad-form questions to the jury "whenever feasible." Tex. R. Civ. P. 277. Applying this rule, we held in *Texas Department of Human Services v. E.B.* that a broad-form parental-termination question, rather than separate questions for each statutory termination ground, is permissible. 802 S.W.2d 647, 649 (Tex. 1990). In 2020, we amended Rule 277 to overrule *E.B.* and require the trial court,

---

[15] We held in *In re A.V.* that even in a parental-termination case, an objection in the trial court is required to preserve error based on broad-form submission. 113 S.W.3d at 363.

43

in a parental-termination case, to "submit separate questions for each parent and each child on (1) each individual statutory ground for termination of the parent–child relationship and (2) whether termination of the parent–child relationship is in the best interest of the child." TEX. R. CIV. P. 277. Under the amended rule, a broad-form termination question is error regardless of the evidentiary support for a particular ground.

The amended rule does not apply here because the case was tried in 2018. However, it underscores the need to ensure that a parent's rights to his child are terminated only on a valid ground supported by the evidence. Because we cannot determine here whether the jury based its verdict on an improperly submitted termination ground, we must reverse the court of appeals' judgment and remand for a new trial.[16] As noted, the judgment of termination is final as to Mother, so the sole focus of the new trial on remand will be whether Father's parental rights should be terminated.

## IV. Conclusion

We hold that legally sufficient evidence supports one of the statutory grounds for termination (Subsection (O)) and the jury's finding that termination was in J.W.'s best interest. Accordingly, Father is not entitled to rendition of judgment. However, we also hold that the termination question was erroneously submitted to the jury in broad

---

[16] We express no opinion on the sufficiency of the evidence to support the Subsection (E) ground and leave it to the trial court to determine in the first instance whether that ground should be resubmitted to the jury.

form, such that the jury could have terminated Father's rights under an invalid and unsupported ground (Subsection (D)).  We reverse the court of appeals' judgment as to Father and remand the case to the trial court for a new trial.

                              _____

                              Debra H. Lehrmann
                              Justice

**OPINION DELIVERED:** May 27, 2022